The next case, Julio Cesar Basuro-Toro-Romo v. Alejandro Mayorkas is submitted on the briefs. And so that brings us to the last case or argument in the case of Save the Colorado v. the U.S. Department of the Interior, Deb Haaland, the Colorado River Energy Distributors Association, and the State of Colorado. Let me come forward. Good morning, Your Honors, and may it please the Court. James Saul on behalf of Appellants, Save the Colorado, Living Rivers, and the Center for Biological Diversity. The central issue in this case is the ongoing failure of the Bureau of Reclamation to assess the true impacts of a changing climate on the management and operation of Glen Canyon Dam as required by NEPA. For two decades and counting, the Colorado River Basin has been gripped by a devastating drought that has significantly curtailed water inflowing into Lake Powell and reduced the reservoir's water storage to a third of its historic capacity. There is no end in sight to this drought, and in fact, the best available climate science suggests it is only likely to worsen than the years ahead. Now, the challenges of operating Glen Canyon Dam in this new era of climate change came to a head during the spring and summer of 2022 when the elevation of Lake Powell dropped to within 30 feet of the minimum power pool. That's the point below which water can no longer move through the dam to generate hydroelectric power. And this caused the Bureau to make a set of sweeping mid-year changes to the release pattern and schedule from Glen Canyon Dam, mostly by withholding water during the early spring months and then releasing additional water than originally planned later during the year. And these mid-year changes were made at least in part under the auspices of the Long-Term Experimental and Management Plan, or LTEMP, that is at issue in this case. The potential for Lake Powell to fall below the minimum power pool was foreseeable at the time the LTEMP's Environmental Impact Statement, or EIS, was issued in 2016. And in fact, that potential was discussed in the Bureau's earlier Colorado River Basin Water Supply and Demand Study that it published in 2012. But that potential was not considered in the EIS itself. Mr. Saul, I guess I'm a little confused that you're focusing on the critical elevation for hydropower generation when your claim is that the law doesn't require that generation at all. I guess it would be helpful if you focused more on the questions of the thresholds and the differential between the climate change analyses and the historical analyses adjusted that the agency relied on. Certainly, Your Honor. I do want to point out that hydropower is relevant here because all seven of the alternatives that were considered in this EIS assume, essentially, an unlimited capacity to generate hydropower. In fact, if you look across the seven alternatives, there's a minuscule, less than a 2% variance in the amount of hydropower that is considered in those alternatives. Well, that's a function of the annual flows rather than the seasonal flows. And there's quite a bit of difference in the seasonal flows. I guess trying to understand here, I mean, the hydropower will either be sustained or not. It will either be above or below that level. But the critical question, both for your hard look and supplemental EIS, is whether the agency properly considered the flows around that level. And I don't want to spend too much time on the charts, but it does seem that figure 416.2 is kind of where this challenge lives. It's just how much of what is going on that is significant is happening under that 9 million acre foot or 8 million acre foot threshold. Can you speak a little bit to when we're talking about that critical elevation for hydropower, why didn't the agency properly account for that? Well, Your Honor, what the Bureau actually did in the EIS is to ignore the projections that it itself had developed as part of the 2012 Basin Study. That 2012 Basin Study, which it described in the EIS as the best available science, created what it called a climate change scenario. I should point out that the very purpose of that 2012 Basin Study was to identify future water supply demand imbalances and to develop and analyze adaptation or mitigation strategies to kind of get around that. Why didn't it take account of that sufficiently when it re-weighted the historical data? Well, the important distinction between the 2012 climate change scenario and the hydrologic traces developed as part of the EIS is that in the EIS, the analysis was entirely backwards looking. What the agency did was to develop a set of 21 hydrologic traces built entirely from the historic record, the flow record from 1906 to 2010. And it had said in the EIS that it wasn't going to use the climate change scenario that it had developed in the 2012 Basin Study because of some perceived uncertainty about it. But that was exactly the purpose of that 2012 Basin Study. The Basin Study was born from a recognition by the Bureau that entirely backward looking flow projections just simply weren't accurate and were not likely to be predictive of what the flow regime was going to be like under future climate change. Even when the low flow regimes were over-weighted? Yes, because the low flow still was only looking at the low flow from the historic record. And as the 2012 Basin Study recognized, flows are going to be significantly lower, or at least are projected to be significantly lower in the wake of climate change. And this was in fact discussed in that 2012 Basin Study. Under the climate change scenario developed as part of the study, the Bureau projected a 9% reduction in mean annual stream flow by mid-century. And it actually projected that Lake Powell would be below the minimum power pool about 24% of the time by 2027. What impacts would that have on the alternatives? That's the fallback in terms of its ultimate decision. Well, again, the Bureau began developing its alternatives on the assumption that hydropower was required, which it is not, and that the reservoir would be sufficiently full to allow hydropower to continue essentially at status quo levels. And again, the range of variation in hydropower spread across the alternatives was less than 2%. What the Bureau did not do is consider any alternative that would have recognized declining capacity to generate hydropower, or even, worst case scenario, potentially consider a total lack of hydropower capacity. Well, let's set aside the hydropower. Because the Bureau did not go with the maximum hydropower alternative, we can argue about whether hydropower generation is incident and or required. But what about all of the other impacts that the statute and then the purpose required the impact statement to address? Well, so the way I think that hydropower continues to be relevant here is because if the Bureau had developed, for example, an alternative that took hydropower off the table, it could have been considered a much broader range of management scenarios that would have been more protective to the downstream resource. The key statute here is the Grand Canyon Protection Act of 1992. That's the statute that requires the development of an EIS, and it requires a long-term operating plan for the dam. And the instruction from that statute is to develop a plan to mitigate adverse impacts to the Grand Canyon downstream. That statute does not require any amount of hydropower generation whatsoever. In fact, Section 1809 of that statute instructs the Department of Energy to assess and consider alternatives for replacing any hydropower that might be lost as a result of changes to the way the dam is managed under the long-term plan. Why wouldn't that be in violation of the Colorado River Storage Project Act? Well, that statute clearly states that the Bureau can generate hydroelectric power as an incident of the other purposes of the statute. The primary purposes created by that statute are the regulation of flow and the facilitation of beneficial use of water throughout the basin. And in this context, the phrase an incident of necessarily means secondary to the other primary purposes. It's clear that you disagree with the methodology used by the government defendants, and you're focusing on hydropower here. But it looks like the government is relying somewhat on the 1956 Act, in that it seems like the Act also mandated that hydroelectric facilities be operated in conjunction with other federal power plants present and potential so as to produce the greatest practical amount of power and energy that can be sold at firm power and energy rates. So doesn't this mean, I guess, from the very beginning that hydropower was a priority at Glen Canyon Dam? What's your response to that? Your Honor, it doesn't indicate that hydropower was a priority. Section 620 of 43 U.S.C. Section 620, which is the 1956 Act, again states that hydropower is permitted as an incident of the other primary purposes of the statute. And in any event, the instructions of that statute are coming up against the pure physical realities of climate change. It is going to be impossible to generate hydroelectric power when and if the reservoir level drops below the minimum power pool, which is, again, under the Bureau's own 20-fold basin study projected to be an increasingly common occurrence by middle of this decade. But set aside the hydropower for a second. All three of your alternatives, why don't those conflict directly with Section 620's requirement that water is stored for beneficial consumptive use? How are you supposed to do that without a dam? Well, Your Honor, again, I think the operation of the dam is just going to come up against the physical realities of climate change. And if you can't get water through the dam to generate hydroelectric power, it's just not going to be feasible in the future. But I guess we're here. Law may or may not reflect the physical realities, but the agency's duties and our duties are set by statute and regulation. That's what we're trying to follow here. So I guess to get back to the question of the hard look, what's missing in that, for example, the 30% that's missing? What scenarios are missing there that are significant to the agency distinguishing between the alternatives that were on the table? Let's just assume that those alternatives were a sufficient set. Well, the main assumption is that, again, all of those alternatives assume that water can get through the dam and be released downstream at any point that the Bureau chooses that to happen. And as the water in the upper basin continues to decline, as the drought worsens, which the climate studies project, and even the Bureau's own 2012 basin study projected, all of those alternatives just will become physically impossible to achieve. What's in the record that reflects that? So I know we have a supplemental EIS claim. There's some mention in there of a 39% chance that it drops below into the low-release range, 80% chance of depleting all storage. But didn't the agency account for most of the range of what happens, at least under the 2007 interim guidelines, that will actually determine how much water is running through annually? Well, the agency ignored the 2012 basin study, which did, in fact, project the scenario that we are contemplating now and that the dam experienced in 2022, which is water falling below the lowest range projected, and with a historic analysis that's reflected in the EIS. And is that below the, right, we've got 30th percentile. The agency does its sensitivity studies down to the 25th percentile. So I'm trying to really get a sense for just how much here is missing, right, the sensitivity studies that it does for the analyses, which is its chosen methodology, get us down to 25% of the flows. Can you just map on the 2012 study, and then I'm also going to ask you to map on your supplemental evidence, onto the lowest range that the agency did consider? Well, I don't have precise numbers to give you in terms of million acre feet, for example. But the EIS acknowledges that the bottom 30% of the range of future likely flows are simply excluded in its own hydrologic trace analysis. Even if the NEPA analysis was sufficient when the EIS was published in 2016, the Bureau here unlawfully failed to prepare a supplemental EIS as required by NEPA. This court has held that the significance threshold for triggering an SEIS is a low standard. That's League of Wilderness Defenders versus Connaughton. And Save the Colorado submitted a letter in June of 2019 to the Bureau requesting an EIS and attaching six new climate studies that collectively show that the analysis included in the EIS was insufficient and woefully inadequate for the purpose. Let me ask you about that because it seems like what's required is that there be significant new circumstances or information. And I guess my question for you is why do these six post-2016 studies reflect significant new information analysis and conclusions? Well, most importantly because they show that the alternatives considered in the EIS are likely to be physically impossible to achieve at any point in the future. And collectively, these six studies show that the drought that the basin is now experiencing is only likely to worsen in the future. The worsening is going to be more extreme than was projected in 2016, and the effects of the drought are going to be felt in the basin sooner than the Bureau projected. What was the bare minimum that the agency would have had to do, in your view, to respond to your request for a supplemental environmental EIS statement? What's required by NEPA, as this court held in Friends of the Clearwater versus Dombeck, is that the agency be open and receptive to the new information, to consider it, and to make a reasoned determination as to its significance. Now, obviously we think that... It needs to have materially altered or affected the process or the result. What's your position there? Because it seems like, and this is what I'm struggling with on this, is it needs to potentially affect the result or simply the process? Clearly, it will affect both, Your Honor. And it kind of, again, goes back to the ability to achieve the alternatives that the agency chose to consider in the EIS. As the drought worsens, as the drought forces shifts in the timing of flow and runoff in the basin, water will become a challenge to get through the dam and to move downstream. And it will become, frankly, impossible for the Bureau to generate any amount of electricity. Well, the Bureau is, I think you acknowledged, engaged in a supplemental environmental impact statement on the annual flows. Why couldn't it wait to conduct that analysis and then come back to the LTEMP subannual flows? It seems like otherwise it's kind of the tails wagging the dog, isn't it? I don't think so, Your Honor. Well, the LTEMP was issued in 2016, and here we are seven, eight years into the 20-year lifespan of the LTEMP. That analysis is urgently needed now in order for the Bureau to be able to assess the effects of climate change and to develop a series of alternatives that are just more feasible in light of climate change. Isn't this an ongoing process? Well, there is a process underway to consider and likely develop an EIS for the next set of interim guidelines that will address annual releases. But that future EIS is still early in its draft phase right now. We're not sure what the analysis will ultimately contain. And importantly here, it won't consider Glen Canyon Dam's operations specifically, and it won't affect the LTEMP or lead to an analysis that might affect the LTEMP. That can only happen through here, in this case, a supplemental EIS for this particular decision. Did you want to reserve the balance? I would. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. John Biese from the Department of Justice on behalf of the Federal Defendants with me at Council's table as Counsel for the Intervenor States and Counsel for the Intervenor Energy Distributor Associations. The Federal Defendants here initiated an administrative proceeding to tackle a very discrete task assigned to it by Congress in the Grand Canyon Protection Act, which was limited to evaluating what timing of releases from the dam would best protect natural, cultural, and recreational resources in Grand Canyon National Park and Glen Canyon National Recreation Area. That is, the timing of the releases and not the volume. The volume of releases is set by other administrative proceedings under other statutes. So the only question before the agencies here is, for a given volume of release from the dam, what's the best way to release it to protect resources downstream, like increasing sediment sandbars in the park or helping the humpback chub, which is a threatened species in the river,  What good is studying the variation of flows in the river if there's no water in it or not enough? So the whole point of having a system of reservoirs is to provide operational certainty for water users in the context where there's hydrological uncertainty. You don't know how much rain there will be each year. And the purpose of the dams is to make sure there's enough water to serve contracts, much like, for instance, the Central Arizona Project, which provides, in a typical year, a million acre-feet of water for Phoenix. Those users need to know the water's available. And Tucson. And Tucson. So you use the reservoirs to hold the water in the years where you get a lot of rain to make up shortfalls in years when you have less. And, of course, the agency isn't... whether you look at it in terms of elevation or acre-feet, the storage runs out. Those are foreseeable scenarios that have been presented before the agency, correct? I would say the agency certainly recognizes that climate change presents an important challenge for the Colorado River Basin that requires further thought about how much water can be relied upon in the system and how much water can be stored and released from the dams. It's not foreseeable that there's at least a significant chance that, I think, storage goes away, in which case none of these alternatives make any sense? The agency, I think, is confronting those questions in the appropriate administrative context and evaluating two things. One, they have a current proceeding underway to consider whether, for the water years where the 2007 interim guidelines are still in place, which is 24, 25, and 26, whether there need to be adjustments to that in light of the drought experience. And then there's a separate administrative proceeding for the post-2026 interim guidelines that will govern the annual amounts. And it could be that they'll learn, decide in those proceedings, that there will be less average inflow into the system. Wasn't this foreseeable on the record of the environmental impact statement that's before us? I think the amount of water overall is unlikely to impact what timing of release best protects the downstream resources. If there's no storage, how are you supposed to time the releases? So I don't think there's an anticipation that there will be no storage. I think the question is whether or not the drought will permit the continued amount of the current releases. Right now the water decrees assume about 15 million acre-feet a year, which was the experience in the early 20th century, and maybe that amount is less. Now maybe the average is going to be, I think the 2012 study projects somewhere between 3.5% and 8.5% decline by 2050. There will still be a lot of water in the system. It will just be less than what's being relied upon. Those questions are best analyzed in the context of the annual amounts released, not in the context of figuring out whether or not releasing it in April or June is best protective of the humpback chub or protects sediment. Why isn't the absence of the driest 30% significant to your analysis of these alternatives? Sure. The agencies looked very carefully at whether or not climate change scenarios would impact how effective the different alternatives were. They did a sensitivity analysis that provided extra weight to the driest years to anticipate potential climate impacts, and they learned that although the aggregate performance of all of the alternatives was affected by climate change, when there were drier years it affected the aggregate performance of all, the relative performance of the different alternatives wasn't impacted materially by different climate scenarios. If that's true for the range from 75% to 25%, there's no reason to think it would be different in lower ranges. Why not? Because if the climate scenarios aren't affecting whether alternative D performs better than alternative B or alternative G, those questions, if it's not sensitive to that, it shows that the alternatives are robust against those different uncertainties. Relatively speaking, they perform the same across all climate scenarios, and so further testing on climate data, as the agency's experts concluded here, would not provide valuable information in deciding between those alternatives. Somewhere in that 30% or in the 0% to 25% that you used for the sensitivity analysis, the storage runs out, right? So I think if we were in a scenario where it looked like storage was running out, that would be something that would be addressed in the context of the annual amounts released, and it would ensure those adjustments ideally should ensure that we wouldn't be in a scenario where the water would run out. But when we're talking about issues that involve, as my friend said, millions of acre-feet of water, and that it would be practically impossible to achieve things in the system, those are questions about what is the reliable amount of water that can be released from the system each year, which is an annual amount question. That's volume. That's a volume question. It's not a timing question. So it's beyond the scope of what the agencies were considering here. I mean, my friend said if you take hydropower off the table, there would be all these other alternatives they might have considered, but that's beside the point because the timing question is governed by taking a given volume. So the 2007 guidelines right now say no matter what the scenario, there's a minimum 7 million acre-feet released every year from Glen Canyon Dam. So that 7 million acre-feet, then the question is what is the timing? That's what this proceeding is looking at. Whether that 7 million acre-feet needs to be reduced to 6 million acre-feet because of drought, that's a question to be considered in the context of the annual amounts released, not in the context of how you distribute that amount across the year. Do you release it in the spring or do you do it evenly across the year? Those are the types of questions that the agencies were looking at in this proceeding, and structuring their decision-making like that is something the agency's prerogative to decide. They're entitled to structure it in the way they think is sensible. So help me understand here in terms of the—so we have in Figure 4.16.2, right, where the petitioners have suggested is the best analysis. The bar on the right, does that reflect the projection-weighted historic scenarios that the agency considered? I believe the bar on the— It says historic and climate change, and I'm just trying to understand. I don't think it shows the weighting in that chart. I think it's just showing what is the range in the historic traces and what is the range in the 2012 study. Okay, so the weighting would have the effect of bringing— I'm trying to understand this concession that you're missing 30 percent and that this is the description of the 30 percent. Even with the weighting of the historical data, the agency still omitted the driest 30 percent of years. So what the agency did with the weighting is they took 21 historical traces, which are like a 20-year experience on the river, what was the inflow and outflow for that 20 years, and you look at it from 1905 to 1925 to 1910 to 1930, et cetera. That's a 20-year trace. They took the driest— If you took them all and weighted them equally, that's 21 traces. It would be about slightly under 5 percent of the weight in the model. Instead of doing that, they took the driest trace and gave it an 18 percent weight in the model so that the modeling would really flag for them if there was an issue with drier traces and how the different alternatives performed. And what they learned was that the different climate scenarios did not affect the relative performance of the alternatives on the resource goals in the LTEMP. It did have an aggregate impact because there was less water, but it didn't affect whether alternative D was better than a different alternative. And so because it's not relevant to the decision before them here, the timing question that they're answering here, they concluded they didn't need to model more of that range because they determined that the alternatives were robust against those different uncertainties, that they weren't sensitive to that in their relative performance. So if they're deciding which one performs best relatively, they pick the one that performs best even in the driest. They didn't show, for instance, that alternative D did better in wet years, but alternative F did better in dry years. It showed that they all performed relatively the same across the different scenarios. Does that sensitivity analysis, and excuse me for being technical, and please correct me if I get any of the technical parts wrong. If I can. Did it consider the low-release regime under the 2007 interim guidelines? You mentioned the 7 million acre feet, for example. Did it consider that? Because the bars don't suggest that it did. That driest year is still wetter than the low-release regime under the guidelines. It considered the full range of inflows. So the 7 million is the release amount, not the inflow amount into the reservoir. It included the range of historical experience, including the driest one in the past 118 years. It did not evaluate what that meant for the annual flows because those are set in a different process. But it did look at what that was, and I think the main point from the agency's perspective is if wet years and dry years aren't affecting which alternative is best, it's not relevant here. Of course, it is important in the context of what the annual amounts are, and the agency is considering it in that appropriate context. And so issues like whether or not there will be a point where the dams are physically unable to release water and things like that, that's a question of annual amount. Is there enough that we can keep releasing 7 million acre feet every year and still have water in the dam? If it turns out in those proceedings, the agency concludes that there need to be adjustments to those amounts to make sure there's water in the dam, I think that is the context where those questions are being considered. If climate change will make the operation of the dams impossible, as my friend said, that's the place where the agency would have to confront that issue and think about it and think how do we change the annual amounts to make sure that we can continue to operate the dams as we're required to by statute. But what the sensitivity analysis showed is it doesn't mean that there's a difference in how the timing of the water within the year should be done. That if the annual amount comes down to 6 million acre feet a year instead of 7 because the long-term average looks like it's 12 million and not 15 million, that will affect, of course, if it's 6 million instead of 7 million, that means if 10 percent is released in April, 10 percent is less than it would be with 7 million. But it doesn't affect the distribution within a year. At some point in the process, the plaintiffs requested supplemental information and a new SEIS, correct? They sent a letter to the agency in 2019 suggesting that a supplemental environmental impact statement. Did the agency respond? The agency did not respond. Is that a NEPA violation right there? We don't believe so. I think from our perspective, the letter raises the same issues that they raised in their comments to the— I thought that if you don't respond that that's just automatically, I mean almost automatically a NEPA violation. The question is then whether it was prejudicial. Am I correct in my analysis? So I guess our view is that we don't necessarily have to respond to every single letter if they don't raise new significant issues. Let's talk about whether or not this is significant because that was the question I had. I think that's appropriate to Judge Hawkins. So let me ask you because you argue that the supplemental statement was not required because the additional climate change information would not inform how best to adapt or manage dam operations through the timing of releases and protect downstream resources, which is what you've been talking about in terms of defending the report in general. But I guess how do you know that the post-2016 studies would not inform the operations if you did not acknowledge them and analyze them? So I guess the agency's analysis in the 2016 environmental impact statement concluded that different climate scenarios did not affect the relative performance of the alternatives on the timing of release. It's obviously relevant to annual amounts, but it's not relevant to the timing of release. And, in fact, the points made in the letter in 2019 and the studies attached to it are quite similar to comments that the plaintiffs made in the administrative process and the agency addressed in its response to those comments. I think it's at 8 ER 1833 and 34. But you didn't respond at all. They didn't respond to the letter, but it didn't raise... I think what you're telling us both here and in your briefing is that there's an easy response to it, but you didn't even bother to do that. So I guess... Even while this has been pending, there's been no response. Is that correct? I believe so. Okay. So you didn't respond at all, correct? Right. Okay. After the 2019 letter. Right. So it wasn't... It seems like the FEIS was based on the Bureau of Reclamation's 2012 study and historical data weighted to reflect potential future drought scenarios. If it turns out that the ongoing mega drought is much worse than anyone forecast, I guess my question, in 2012, isn't it possible that the new climate science would change the analysis in the environmental impact statement? So I think the agencies concluded in the 2016 environmental impact statement that those questions may be very important to the question of the annual volume, but they were not materially affecting the relative performance of the alternatives on the timing. And since this proceeding was limited to the timing question, they didn't think that information was relevant to those questions. The agency is obviously looking at those questions in the context of the annual volume question, which is where we believe they're most relevant in the appropriate administrative context where the questions raised by the 56 and 68 Act are being addressed, not the questions addressed by the Grand Canyon Protection Act here. Mr. Bies, I guess, again, just to hone in on this, I think the argument here in some ways centers on looking at page 44 of your brief. You argue, as you do here today, there's common sense that modeling factors aren't likely to affect the relative performance of the alternatives under consideration in terms of the variation of the flows that you're looking at. Line D, the cyan line, lines pretty well up with the other ones, and so I see that point on the record. It's the following sentence, which is not supported by any citation to the record or otherwise that I'm hung up on. Sure, the variation within a range doesn't seem to make a difference according to the sensitivity analysis, or that might be an area where we're going to defer, but the range itself seems to have the bottom of that range seems to be missing the consideration of significant information about how much water is going to be available to time throughout the year. So if there are concerns about how much water is available in the system, that is something that would have to be addressed in the context of the agency's applications under the 56 and 68 acts in the context of the long-term operating criteria, and once they are addressed there, I think the LTEMP reasonably assumes that there will be some annual volume being released, whether that's 6 million or 5 million or 7 million acre feet. But if it reasonably assumes, I mean, did the final EIS assume a release of 5 million acre feet? I didn't see that. No, it assumed, as was legally required when they did it, that there was a minimum of 7 million acre feet being released because that was the legal requirement under the 2007 guidelines at the time. But if the pattern of distribution, the pattern of timing within the year needs to be reduced because the annual volume is reduced, that isn't something that would be considered here unless that reduction affected when it should be released. If we're only releasing 5 million, should we release more in the spring or a question like that? But the sensitivity analysis showed that it wouldn't affect the relative performance of the alternatives, so it wouldn't affect which alternatives should be selected, regardless of whether it's 9 million or 7 million or 6 million. So are you saying that the six studies that came out later, that the plaintiff's appellants are pointing to, would not have had an impact or affected the sensitivity studies? Yeah. I think the agency's analysis, their experts concluded that the amounts weren't sensitive to differences in climate scenarios, that they were robust against more drought situations and more wet situations as we see. So my question is just process and procedure at this point, though. You didn't need to submit a declaration or a statement to that, acknowledge the response because it wouldn't have, there's no prejudice? Is that what you're arguing? And what's your best case? I think if the court's view is that we should have responded, I think our argument would still be that it's harmless error because those studies aren't relevant based on the analysis in the final environmental impact statement. And obviously things like the 2022 supplemental environmental notice of intent isn't even relevant to the 2019 letter because they came out much later and aren't part of the case. I see my time is up. Could I ask just one more question about the record just so I can understand this? Can you help me with the concordance between the, so you said very helpfully that the final environmental impact statement and the sensitivity analysis considered flows all the way down to the bottom of the low release range that's provided by the interim guidelines. How does that match up with the 75 percentile mean and 25th percentile sensitivity analysis that you do? I'm just having trouble finding in the environmental impact statement where it states and considers that the bottom of the possible flows under the guidelines at that 7 million acre feet. So I guess they modeled everything and what they were looking at was the relative performance of the different alternatives at the bottom, in the middle, at the top of the range, across all of the possible climate scenarios because they don't know what the future will hold. They can only see how robust the alternatives perform in different scenarios. And so the places where they looked at that and concluded there's not a meaningful difference in their performance, you can see it in the ROD at 4 ER 641 to 42. You can see it in the EIS at 6 ER 1113 and then again at 8 ER 1742 and I think in that section more broadly about climate change there. And then again in the response to the comments from the plaintiffs at 8 ER 1833 to 34. I think in all of these places they make the point that when we study the sensitivity to wet and dry scenarios and that kind of uncertainty is what you're going to get with climate change, more variability as we're seeing now in California. There is also more rain sometimes, more drought sometimes. The purpose of the dam is to even that out and provide operational security to water users. Thank you very much for your patience. We ask the court to affirm the decision below. Thank you. Thank you. Your Honors, the argument that the LTIP is just a narrow decision that is unrelated to the annual release volume and would therefore be unaffected by future climate change is belied by the EIS itself. In the EIS the Bureau admits that climate change effects such as decreased inflow into the reservoir system and greater evaporation and evapotranspiration losses, quote, would affect all of the LTIP alternatives. That's 6 ER 1113. And they even admit that these climate change issues will require the Bureau to make specific adjustments to daily and monthly release volumes under the LTIP. That's 5 ER 1018. And the experience of 2022 shows how this is likely to happen in the future. Counsel for the Bureau suggests that the LTIP was intended to create operational certainty. Operational certainty went out the window in 2022. And that is likely to be the norm going forward due to climate change. To the extent that the Bureau might have considered the available storage elsewhere in the system, including reservoirs further upstream, as a means to balance out flows, lower flow years versus high flow years, one of the studies included with Save the Colorado's SEIS letter, the Ree and Salazar study at 2 ER 276, actually projects with 80% certainty that due to climate change and the ongoing drought, all of the storage in the upper basin will be depleted. So that kind of balancing technique just won't be available to it. And with that, we ask the court to reverse the decision of the district court and vacate the record of decision for the LTIP here. Thank you, Your Honor. Thank you very much, Mr. Saul, Mr. Beeson, your other colleagues at counsel table. Appreciate your presence here today and the oral argument presentations. The case of Save the Colorado versus U.S. Department of the Interior, Colorado River Energy Distributors Association in the state of Colorado is now submitted. And that concludes our calendar for today. So we are adjourned. Thank you.
judges: MURGUIA, HAWKINS, JOHNSTONE